IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 7, 2005

## STATE OF TENNESSEE v. MARCUS CARTER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-04521     Arthur T. Bennett, Judge**

———————————

**No. W2004-01936-CCA-R3-CD  - Filed August 2, 2005**

———————————

The defendant, Marcus Carter, pled guilty to one count of kidnapping, a Class C felony, and was sentenced as a Range I, standard offender to four years in the county workhouse.  The issue raised on appeal is whether the trial court erred in denying alternative sentencing.  After our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Robert Wilson Jones, Shelby County Public Defender, and Tony N. Brayton, Assistant Public Defender, for the appellant, Marcus Carter.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lee Coffee, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The facts, as announced by the State at the submission hearing, were as follows:

The basis for this plea is as follows; on – Actually a period of time that extended over February 5th and February 6, 2003, the defendant went to the Life Blood business, which is located in the one thousand block of Madison, where the victim, Ms. Jodie Taylor[,] was employed by Life Blood.

Ms. Taylor was – this defendant, rather, assaulted Ms. Taylor inside of that business and held her against her will for approximately four hours.

They had been dating for approximately two years. The victim was in the process of attempting to break up this relationship with the defendant.

This defendant went inside of the business, confronted the victim, took her cell phone from her, struck her a few times with that cell phone, would not allow her to leave that business. This victim was able to break free at some point, called her boss to report to her boss that she was being detained against her will.

Police officers were called to Life Blood, this business, located [the defendant] in an area hiding in an abandon[ed] car near this place of business.

The defendant had thirteen small bags of marijuana, packaged for sale on his person when he was arrested by these police officers. That marijuana tested positive, weighing some twenty-three point five grams.

Ms. Taylor was interviewed by the police. And she told the police that the defendant had entered the business through a secured lot after a car had come into the business and had gone through a gate.

He had thrown her down on the parking lot, had taken her cell phone by force, had made her use her identification card to swipe the secured door to gain entry into the business. And that he held her against her will for four hours and would not return her property during the course of holding her for four hours.

The defendant was interviewed by police officers, he waived his rights and he gave a statement in which he admitted that he did struggle with this victim inside of the business, but denied holding her against her will, and indicated to the police that he went there to discuss the troubling nature of the relationship that he had with Ms. Taylor.

To this recitation, defense counsel advised the trial court that the defendant wished to enter an Alford "best interest guilty plea."

At the defendant's July 29, 2004, sentencing hearing, Elonda Reed, a first cousin of the defendant, testified that the defendant and the victim had dated, during which time the victim learned that he had impregnated another woman.

Jeanette Stanback, a former investigator with the Shelby County Public Defender's office, testified that she interviewed the victim on April 13, 2004. The victim told her that she did not tell the police that a kidnapping had occurred and that she did not want the defendant "locked up." Ms. Stanback acknowledged that the victim said that the defendant "kept striking her with her cell phone and . . . started to cut her hair off." Ms. Stanback said the victim's "indication" during the interview

was that she tried to get away from the defendant several times that night, but he kept pursuing her and did not allow her to leave his presence.

The defendant testified, saying that his visit to the victim's place of employment was prearranged to discuss their failing relationship and that he previously had visited the victim at work. According to the defendant, the victim worked the 10:30 p.m. to 7:00 a.m. shift. The defendant said he entered the premises of the victim's employer through the security gate, as a car was leaving. He said the victim, who was standing outside smoking a cigarette, was expecting him. The defendant said he and the victim went inside her workplace but denied he had coerced her into the building and said she was free to "mov[e] around." The defendant said they discussed their relationship until the cell phone they shared rang; the call was from a woman who was supposed to pick the defendant up from the victim's place of employment later that night. The victim demanded the phone, but the defendant refused to give it to her. He admitted using force against the victim to prevent her from getting the phone, saying, "I pushed her off of me, she hit the ground a couple of times," but denied hitting her with the phone or in the ribs with his hands. The defendant said the argument escalated to verbal assault between him and the victim. According to the defendant, he left the premises between 2:00 and 2:30 a.m. when the victim threatened to call the police. He went and sat in an abandoned car near the facility.

The defendant acknowledged he had forfeited his bond on three occasions as a result of being late to court. He admitted he had been arrested in December 2003 for domestic assault but said that case had been dismissed. He also admitted he had three prior convictions for driving on a revoked license.

The defendant said he was employed at the time of the incident and planned to obtain a GED. Asked what he had been doing to rehabilitate himself while incarcerated, the defendant said he had completed anger management, life skills, and alcohol and drug classes. Asked if he intended to bother the victim in the future, the defendant said, "Never, ever again. This has been like the worst tragedy in my life. And I have learned severely from this, you know. And I want to go back, go home, and achieve my goals, and start my life back over the best way I can . . . ."

The victim, who denied planning to meet the defendant at her place of employment on the night of February 5, 2003, testified that he approached her while she was smoking outside on her break. She said the defendant made her enter the building where they argued and "wrestl[ed]" and she repeatedly asked him to leave. In addition, she offered the defendant forty dollars to get a hotel room and leave her alone. Asked why she did not report her situation to a courier who arrived, the victim responded, "And I couldn't say anything to the courier . . . [the defendant] was breathing on my neck." The defendant unsuccessfully tried to force her into her car by hitting her in the ribs. He then forced her back inside her workplace where he pushed her and she tried to escape, but the defendant pursued her. She said, "[The defendant] got in my face again then, talking about, oh, you trying to get away, you know, you don't want to talk. And, I didn't want to talk."

The victim stated she did not want the defendant on probation and did not think he would leave her alone unless he was in custody. The victim also said that one month before the incident, she "had the police [go] to [her] house and remove [the defendant] and his belongings . . . [b]ecause [she] couldn't get him to leave [her] alone." Asked if she feared for her safety if the defendant was released from custody, the victim said, "Yes. Because he's - because of everything that's happened already. He doesn't take no for an answer." She said that the defendant showed up at her work again one month after the incident which was the basis for this charge and that he "harassed [her] continually from jail."

## ANALYSIS

The defendant's sole issue on appeal is whether the trial court erred in denying alternative sentencing. When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

The Tennessee Criminal Sentencing Reform Act of 1989, enacted to "promote justice," Tenn. Code Ann. § 40-35-102 (2003), provides that the sentence imposed upon an offender should be the "least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4). Thus, trial judges are "encouraged" to use "alternatives to incarceration

that include requirements of reparation, victim compensation and/or community service." Tenn. Code Ann. § 40-35-103(6). An especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(6).

If an offender meets the criteria under Tennessee Code Annotated section 40-35-102(6), the trial court "must presume that he is subject to alternative sentencing." Ashby, 823 S.W.2d at 169. However, if the court is presented with "evidence sufficient to overcome the presumption, then it may sentence the defendant to confinement according to the statutory provision." Id. The presumption in favor of alternative sentencing may be overcome by facts contained in the presentence report, evidence presented by the State, the testimony of the accused or a defense witness, or any other source, provided it is made part of the record. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

Evidence sufficient to overcome the presumption in favor of alternative sentencing includes evidence showing that "[c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct," "[c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses," or "[m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant." Tenn. Code Ann. § 40-35-103(1)(A)-(C); see Ashby, 823 S.W.2d at 169.

Although the defendant claimed to have been invited to the victim's workplace to discuss their relationship, the trial court said, "And I don't find that he told the truth. . . . The Court finds specifically that he did not tell the truth when he said that she was looking for him to be there that night. I don't believe that to be the case, as a trier of fact." The trial court also said that it found the defendant to be "a danger to the community, especially to these people that he's in contact with, women." The trial court did not believe the defendant's statement to never interact with the victim again and believed him to be "a threat to [the victim]." Furthermore, the fact that the defendant had a history of harassing the victim, three forfeitures, and three convictions for driving on a revoked license does not show an aptitude for potential for rehabilitation or treatment. Accordingly, we conclude that the record supports the trial court's determination that incarceration was appropriate for the defendant.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE